IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARON MINGO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MAGIC HAT CONSULTING | : | NO.  14-5433 |

## MEMORANDUM

**Padova, J.**                                                                                             **July 30, 2015**

Plaintiff, Aaron Mingo, has brought this action against his former employer, Magic Hat Consulting, asserting claims for racial discrimination in employment and hostile work environment in violation of both Title VII of the Civil rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 *et seq.* ("PHRA").  Before the Court is Defendant's Motion for Summary Judgment.  For the reasons that follow, we grant the Motion.

## I.      BACKGROUND

Plaintiff, who is an African American man, began working as an Account Executive for Magic Hat on February 20, 2013.  (Compl. ¶ 2; Def.'s Statement of Material Facts ("SMF") ¶ 12; Def. Ex. B2 at 1; Mingo Dep. at 193.)  He was paid an annual salary of $50,000.00 plus commissions, with a promise that his salary would increase after six months if he met certain performance goals.  (Def. Ex. B2 at 1; Mingo Dep. at 106-07.)  Magic Hat provides consulting and recruiting services for its clients.  (Lyon Aff. ¶ 2.)  Plaintiff's primary responsibility at Magic Hat was bringing in new business in the areas of staff augmentation and strategic delivery partnerships.  (Mingo Dep. at 112.)  He was employed by Magic Hat for six months, during which he "never brought in any new business, never made any sales, and never produced any

revenue." (Lyons Aff. ¶ 16; see also Mingo Dep. at 173-74.)  On August 29, 2013, Magic Hat terminated Plaintiff's employment.  (Lyons Aff. ¶ 17; Compl. ¶ 21; Def.'s SMF ¶ 14.)

The Complaint asserts three grounds for relief.  Count I alleges that Magic Hat discriminated against Plaintiff on the basis of his race in violation of Title VII.  (Compl. ¶¶ 30-31.)  Count II alleges that Magic Hat subjected Plaintiff to a hostile work environment on the basis of his race in violation of Title VII.  (Id. ¶¶ 36-37.)  Count IV alleges that Magic Hat discriminated against Plaintiff on the basis of his race in violation of the PHRA.[1]  (Id. ¶ 52.)

## II.    LEGAL STANDARD

Magic Hat has moved for summary judgment as to all of Plaintiff's claims.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the

---

[1]The parties stipulated to the withdrawal of Count III of the Complaint, which had asserted a claim of retaliation in violation of Title VII, and to the withdrawal of language regarding retaliation contained in Count IV, paragraph 52.  On November 13, 2014, we ordered that Count III and the retaliation language contained in paragraph 52 be withdrawn.  (See 11/13/14 Stipulation and Order.)

district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Racial Discrimination

In Counts I and IV of the Complaint, Plaintiff contends that Magic Hat discriminated against him in violation of Title VII and the PHRA by failing to provide him with the same business opportunities as Caucasian employees, paying him less than Caucasian employees, and firing him without warning or the opportunity to correct his work.[2]  Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The PHRA provides that it is "an unlawful discriminatory

_____

[2] As we mentioned above, Count I of the Complaint asserts a claim of racial discrimination pursuant to Title VII, and Count IV of the Complaint alleges that Magic Hat discriminated against Plaintiff because of his race in violation of the PHRA.  (Compl. ¶¶ 31-32, 52.)  Magic Hat has moved for summary judgment on Count IV.  However, Plaintiff does not mention his PHRA claim in his response to the Motion for Summary Judgment.  Rather than assume that Plaintiff has abandoned this claim, we apply his Title VII arguments to his PHRA claim.

practice . . . [f]or any employer because of . . . race, color, religious creed, . . . age, [or] sex, . . . to refuse to hire or employ or . . . discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment."  43 Pa. Stat. Ann. § 955(a).  We analyze claims brought pursuant to Title VII and the PHRA pursuant to the same standard.  See Verma v. Univ. of Pa., Civ. A. No. 11-611, 2012 WL 1835727, at *7 (E.D. Pa. May 18, 2012) ("Discrimination claims under the PHRA are subject to the same standards as Title VII for purposes of summary judgment." (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999))).

The parties agree that Plaintiff's discrimination claims should be analyzed pursuant to the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). (Def.'s Mem. at 6; Pl.'s Resp. at 6.)  "Under McDonnell Douglas, the plaintiff bears the initial burden of demonstrating a prima facie case of unlawful discrimination . . . ."  Dellapenna v. Tredyffrin/Easttown Sch. Dist., 449 F. App'x 209, 213 (3d Cir. 2011) (citing McDonnell Douglas, 411 U.S. at 802).  In order to establish a prima facie case of discrimination, Plaintiff must establish:  "(1) he is African American; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) similarly situated persons who are not African American were treated more favorably."  Hall v. E.I. du Pont de Nemours & Co., 586 F. App'x 860, 863 (3d Cir. 2014) (citing Jones, 198 F.3d at 410-11).

If Plaintiff succeeds in establishing a prima facie case of discrimination, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision."  Dellapenna, 449 F. App'x at 213 (citing McDonnell Douglas, 411 U.S. at 802).  If Magic Hat is able to meet its "'relatively light burden,' the burden of production returns to . . . [P]laintiff, who can defeat summary judgment only by showing by a preponderance of the

4

evidence that [Magic Hat's] stated reason is pretextual."  Id. (quoting and citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).   Consequently, if Magic Hat is able to state a legitimate and nondiscriminatory reason for its treatment of Plaintiff, Plaintiff "must produce evidence that either '(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of'" the adverse employment action.  Id. (quoting Fuentes, 32 F.3d at 762). Plaintiff cannot meet his burden at this last step simply by showing that Magic Hat was wrong, rather, he "must uncover 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in [Magic Hat's] explanations that would permit a reasonable factfinder to believe that [Magic Hat] did not actually act for its stated reasons."  Id. (quoting Fuentes, 32 F.3d at 765).

Magic Hat argues that it is entitled to summary judgment with respect to Counts I and IV because Plaintiff cannot establish a prima facie case of racial discrimination and cannot show that its legitimate, nondiscriminatory reasons for its actions are pretextual.  Magic Hat agrees, for the purposes of this Motion only, that Plaintiff has met the first two elements of a prima facie case of discrimination, i.e., that he is a member of a protected class and that he was qualified for his job.  (Def.'s Mem. at 8.)  However, Magic Hat contends that Plaintiff cannot establish that he was subject to an adverse employment action or that he was treated differently than his Caucasian coworkers with respect to his assertions that the company failed to provide him with the same business opportunities as Caucasian employees, payed him less than Caucasian employees, and fired him without warning or the opportunity to correct his work.

      1.   <u>Business opportunities</u>

Plaintiff contends that Magic Hat discriminated against him on the basis of his race by failing to provide him with the same business opportunities as Caucasian employees because he was excluded from meetings with clients and coworkers. Specifically, Plaintiff contends that he was only invited to client meetings if the prospective client was African American. He also maintains that he was never invited to lunch meetings with Magic Hat's top salesperson, Colleen DiFabio, even though all of Magic Hat's other salespersons had that opportunity. Since Magic Hat has conceded that Plaintiff is African American and was qualified for his job, to determine whether Plaintiff has established a prima facie case of race discrimination we need consider only whether the record contains facts sufficient to establish that he suffered an adverse employment action and that "similarly situated persons who are not African American were treated more favorably." <u>Hall</u>, 586 F. App'x at 863 (citation omitted).

The Third Circuit defines the phrase "adverse employment action" under Title VII as an action that is "'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004) (quoting <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001)). "Termination, failure to promote, and failure to hire all constitute adverse job actions," as do "actions that reduce opportunities for promotion or professional growth." <u>Walker v. Centocor Ortho Biotech, Inc.</u>, 558 F. App'x 216, 219 (3d Cir. 2014) (citing 42 U.S.C. § 2000e-2(a)(1), and <u>Storey</u>, 390 F.3d at 764); <u>cf. Mieczkowski v. York City Sch. Dist.</u>, 414 F. App'x 441, 447 (3d Cir. 2011) (noting that written reprimands do not constitute adverse employment actions where "the plaintiff 'was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location in the [workplace], did not have his hours or work changed or

altered in any way, and . . . was not denied any pay raise or promotion as a result of these reprimands'" (first alteration in original) (quoting Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006))).

An employee's exclusion from meetings, without evidence that these exclusions led to material changes to the terms and conditions of his employment, is not in and of itself an adverse employment action. See Vera v. Pa. Higher Educ. Assistance Agency, No. 1:09-CV-341, 2013 WL 1178232, at *13 (M.D. Pa. Feb. 26, 2013) (report and recommendation), adopted, 2013 WL 1178230 (M.D. Pa. Mar. 20, 2013). The plaintiff in Vera claimed that his exclusion from two client meetings constituted actionable discrimination under Title VII. Id. The court found, however, that this exclusion did not constitute actionable discrimination both because the exclusionary conduct was "extremely limited" and because the plaintiff failed to "point to any evidence to show that his client relationships were in any way impacted as a result of his absence from two meetings, and also because [he had] not shown that his absence from these meetings had any relationship with any other adverse employment action he suffered." Id.; cf. Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 816, 822 (E.D. Pa. 2005), aff'd, 245 F. App'x 184 (3d Cir. 2007) (determining that the plaintiff had satisfied the requirement that he show an adverse employment action based on his age where he presented evidence that he had been excluded from meetings and training in which younger employees were included; his evaluation had been lowered unexpectedly; his boss recommended that he accept early retirement; and the manager of employee relations did not deny his statement that management wanted to keep younger employees).

There is evidence in the record that Jim Lyons, Magic Hat's CEO, advised Plaintiff to spend time with DiFabio in order to get the "Magic Hat messaging right." (Mingo Dep. at 126; Lyons Aff. ¶ 1.)  There is also evidence that Plaintiff's Caucasian coworkers George Winnick, Kurt Foehl and Jim Lavelle each went to lunch with DiFabio at least once to learn how she sells and went with DiFabio to visit a client site. (Mingo Dep. at 142-44.)  However, DiFabio would only take Plaintiff to a client meeting that involved an African-American client. (Id. at 144-46, 180.)  There is further evidence in the record that Foehl, Magic Hat's Vice President of Sales, set up a meeting for Plaintiff with two African-American individuals who worked for Magic Hat's client SunGuard. (Id. at 131-32, 204.)  However, the record contains no evidence that, during Plaintiff's employment with Magic Hat, DiFabio or any other Magic Hat salesperson or executive had a meeting with a Caucasian client from which Plaintiff was excluded.  There is also no evidence that Plaintiff's sales performance or client relationships were negatively impacted because DiFabio did not spend time with him.

We conclude, accordingly, that Plaintiff's contention that he suffered an adverse employment action because he was excluded from business opportunities afforded to his Caucasian coworkers is not supported by the record as there is no evidence that his exclusion from lunches with DiFabio resulted in a change to the terms and conditions of his employment. See Vera, 2013 WL 1178232 at *13.  We further conclude, accordingly, that Plaintiff has failed to satisfy his burden of presenting evidence that would establish a prima facie case of employment discrimination arising from his exclusion from certain business opportunities, and we grant Defendant's Motion for Summary Judgment as to this aspect of Counts I and IV.

2.   <u>Salary</u>

Plaintiff maintains that Magic Hat discriminated against him on the basis of his race in that he was paid less than Caucasian employees.  Specifically, he argues that he was paid less than his coworker George Winnick, even though they both had similar work experience prior to being hired by Magic Hat and they both performed the same job duties.  Magic Hat does not contest Plaintiff's assertion that being paid less than similarly situated coworkers not in his protected class is an adverse employment action.  Consequently, in order to determine whether Plaintiff has established a prima facie case of disparate treatment in connection with his salary, we need only determine whether there is evidence that Magic Hat paid him less than similarly situated employees who are not African American.

The Third Circuit has explained that, "in the context of a wage discrimination claim based upon race, a plaintiff can establish disparate treatment by producing evidence that s/he was 'performing work substantially equal to that of (White employees) who were compensated at higher rate(s)' than the Black plaintiff." <u>Williams v. URS Corp.</u>, 124 F. App'x 97, 99 (3d Cir. 2005) (quoting <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1087 (3d Cir. 1996)). Plaintiff has identified evidence in the record that he and Winnick both had the same job responsibilities, namely bringing in new business in both strategic delivery partnerships and staff augmentation.  (Mingo Dep. at 160.)  Plaintiff was paid an annual salary of $50,000.00 plus commissions for this work, and Winnick was paid $120,000.00 plus commissions.  (Lyons Aff. ¶¶ 7, 9.)  We conclude that Plaintiff has satisfied his burden of producing evidence that he performed work substantially equal to that of a Caucasian employee who was paid more than twice his annual salary.  We further conclude that Plaintiff has satisfied his burden of establishing a prima facie case of discrimination with respect to his claim that he was paid less

9

than Caucasian employees.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) (noting that a plaintiff's "burden of establishing a prima facie case of disparate treatment is not onerous").

Pursuant to McDonnell Douglas, the burden of production shifts to Magic Hat to articulate "some legitimate, nondiscriminatory reasons for this pay disparity."  Roberts v. Lincoln Nat'l Corp., Civ. A. No. 13-6235, 2014 WL 7235984, at *5 (E.D. Pa. Dec. 19, 2014) (citing McDonnell Douglas, 411 U.S. at 802).  Magic Hat maintains that it paid all of its employees, including Plaintiff, based upon their "work experience, prior salaries, and the respective salaries each could command on the open market." (Lyons Aff. ¶ 14.)  Magic Hat has submitted evidence that it based Plaintiff's starting salary on his work experience, "his salary at his prior employer, and the salary that [he] could command in the marketplace." (Id. ¶ 7.)  Lyons avers in his Affidavit that he based Plaintiff's annual starting salary on the following factors:

> he only worked at each of his previous employers for short periods of time, often less than two or three years, without any long tenured positions; his overall sales numbers seemed low for industry standards, on average less than $1 million per year; and he had been fired from his previous employer.  Aaron Mingo told us that his salary at his previous employer was $55,000 plus commissions.

(Id.)  In addition, Plaintiff's resume shows that, prior to joining Magic Hat, he had worked in sales since 1999.  (Def. Ex. B1.)

The record evidence shows that Winnick had more sales experience, and had been more successful in sales before he joined Magic Hat, than Plaintiff.  Indeed, Winnick began working in sales in 1989, and thus had a decade more relevant job experience than Plaintiff.  (Def. Ex. B3.)  There is also evidence that, in 1991 and 1992, Winnick "[o]versaw sales in a franchise territory with annual sales of $22 [million]" and personally "achieved $2 [million] in new sales." (Id.)  In 1996, while he was working for another employer, Winnick had $1.2 million in sales, and

10

between 1997 and 1999 he achieved a personal revenue target of $1.7 million each year. (Id.) Between 2000 and 2005, Winnick was vice-president for sales for the same employer and achieved personal sales targets of $1 million per year while also reaching annual revenue objectives between $13 million and $23 million. (Id.) Between 2005 and 2006, while he was the Senior Director for National Sales Operations for another employer, he implemented a new strategy that increased revenue in his area by 20%. (Id.) Between 2006 and 2009, while he was employed by another employer, he "[p]ropelled sales from $600 [thousand] to $4.8 [million]." (Id.) Lyons states in his Affidavit that he based Winnick's "annual salary of $120,000 . . . on his experience and other competing job offers that he had received." (Lyons Aff. ¶ 9.)

There is also evidence in the record regarding the annual salaries that Magic Hat paid to its three other salespeople:  Christina Croft, DiFabio, and Lavelle. (Id. ¶P 10-13.) Croft, who began working for Magic Hat on a part-time basis in 2010, was paid an annual salary of $50,000.00 plus commissions when she was made a full-time salesperson. (Id. ¶ 11.) Lyons based Croft's salary on her work experience and the salary that she could command on the open market. (Id.) DiFabio began working for Magic Hat in 2007, when it was founded. (Id. ¶ 12.) While she was initially paid solely by commission, she was later paid an annual salary of less than $50,000.00 per year plus commissions. (Id.) At the time Plaintiff was employed by Magic Hat, DiFabio was the top salesperson at Magic Hat and was paid $100,000.00 per year plus commissions. (Id.) Lavelle started working for Magic Hat in August 2013, shortly before Plaintiff was fired, at an annual salary of $93,000.00 plus commissions. (Id. ¶ 13.) He was the Director of Business Development at his previous employer, where he brought in an average of $7 million to $12 million in yearly revenue, and his annual salary was $94,000.00. (Id.) Lyons based Lavelle's starting salary on his work experience and prior salary. (Id.) In light of this

11

evidence, we conclude that Magic Hat has satisfied its burden of production by articulating legitimate and nondiscriminatory reasons for its decision to pay Plaintiff less than it paid Winnick, DiFabio, and Lavelle.  See Roberts, 2014 WL 7235984, at *5.

Pursuant to McDonnell Douglas, the burden shifts back to Plaintiff to prove, by a preponderance of the evidence, that Magic Hat's stated legitimate and nondiscriminatory reasons for paying him less than Winnick, DiFabio, and Lavelle are pretextual.  See Fuentes, 32 F.3d at 763.   Consequently, in order to defeat Magic Hat's Motion for Summary Judgment, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764 (citations omitted).   Moreover, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  Id. (citations omitted).

Plaintiff has failed to come forward with any evidence to discredit Magic Hat's asserted reasons for paying him $50,000.00 per year plus commissions.  He has also failed to submit any evidence that discrimination was more likely than not Magic Hat's motivation for paying him less than some of his Caucasian coworkers.  Since Plaintiff has failed to satisfy his burden of showing by a preponderance of the evidence that Magic Hat's stated reasons for paying him less than some of his Caucasian coworkers is pretextual, we conclude that he has not responded to the Motion for Summary Judgment with a factual showing sufficient to establish that Magic Hat intentionally discriminated against him by paying him less than Winnick, DiFabio and Lavelle.

See Celotex, 477 U.S. at 322; see also Anderson, 621 F.3d at 271.  We therefore grant Magic

Hat's Motion for Summary Judgment as to this aspect of Counts I and IV.

> 3.    Poor performance and termination

Plaintiff asserts that Magic Hat discriminated against him on the basis of his race because

he was terminated without prior warning that his work was substandard, while another employee

who is not African American received a warning in the form of a reduction in salary as a result

of poor performance.  Magic Hat does not dispute that termination is an adverse employment

action.  Thus, in order to decide whether Plaintiff has established a prima facie case of race

discrimination in connection with his termination, we need only determine whether there is

evidence that Magic Hat treated Plaintiff differently in connection with his termination than it

treated other, similarly situated, employees who are not African American.  The Third Circuit

has explained that "[w]hile 'similarly situated' does not mean identically situated, the plaintiff

[and the comparators] must nevertheless be similar 'in all relevant respects.'"  Opsatnik v.

Norfolk S. Corp., 335 F. App'x 220, 222-23 (3d Cir. 2009) (quoting Holifield v. Reno, 115 F.3d

1555, 1562 (11th Cir. 1997)).  "In determining whether similarly situated nonmembers of a

protected class were treated more favorably than a member of the protected class, the focus is on

the particular criteria or qualifications identified by the employer as the reason for the adverse

action."  Simpson v. Kay Jewelers, 142 F.3d 639, 649 (3d Cir. 1998) (citing Ezold v. Wolf,

Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992)).

There is evidence that Magic Hat terminated Plaintiff because of his lack of performance.

(See Lyons Aff. ¶¶ 16-17.)  There is also evidence that he was never given any negative

feedback about his performance prior to his firing.  (See Mingo Dep. at 169.)  Plaintiff asserts

that Winnick, who is Caucasian, was treated more favorably.  As we previously discussed, there

is record evidence that Winnick had the same job responsibilities as Plaintiff.  (Id. at 160.)  There is also evidence that Winnick performed his job poorly, and that Magic Hat chose to lower his salary from $120,000.00 per year to $100,000.00 per year because of his poor performance.  (Id. at 169-70; Lyons Aff. ¶ 18.)  Accordingly, we conclude that Plaintiff has identified evidence in the record that a similarly situated employee of Magic Hat who is not African American was treated more favorably than Plaintiff with respect to poor work performance.  We further conclude, accordingly, that Plaintiff has satisfied his burden of establishing a prima facie case of discrimination with respect to his claim that he was treated less favorably than Caucasian employees in connection with his poor performance and termination.  See Burdine, 450 U.S. at 253 (stating that a plaintiff's "burden of establishing a prima facie case of disparate treatment is not onerous"); Simpson, 142 F.3d at 646 (noting that the inquiry "at the prima facie case stage of the analysis" may be "based on a few generalized factors" (citations omitted)).

Pursuant to McDonnell Douglas, the burden of production shifts to Magic Hat "to articulate a legitimate, nondiscriminatory reason" for terminating Plaintiff's employment without warning for his poor performance.  Dellapenna, 449 F. App'x at 213 (citing McDonnell Douglas, 411 U.S. at 802).  Lyons states in his Affidavit that he fired Plaintiff because, in six months as an employee of Magic Hat, Plaintiff had "never brought in any new business, never made any sales, and never produced any revenue."  (Lyons Aff. ¶¶ 16-17.)  Lyons further states that he chose to lower Winnick's salary, rather than fire him, because "Magic Hat had already invested a lot of money in George Winnick (he was the highest paid sales person at Magic Hat), and because I understood that the type of business that George Winnick was trying to develop were bigger business deals that took a longer time to develop."  (Id. ¶ 18.)  Winnick left Magic Hat within a month after his salary was reduced.  (Id.)  Lyons also states in his Affidavit that he made the

14

decision to fire other Magic Hat employees, all of whom are Caucasian, without first lowering their salaries.  (Id. ¶ 19.)  Those employees are Chris Rehmann, who was terminated in 2007; Joelle Guinup, who was terminated in 2009; Drew Talone, who was terminated in 2012; Frank Daley, who was terminated in 2014; and Mary Beth Ambrose, who was terminated in 2014.  (Id.)  In light of this evidence, we conclude that Magic Hat has satisfied its burden of production by articulating legitimate and nondiscriminatory reasons for its decision to treat Winnick differently than it treated Plaintiff in connection with their poor work performance.  See Dellapenna, 449 F. App'x at 213 (stating that the employer's burden of production is "relatively light" (quoting Fuentes, 32 F.3d at 763)).

Plaintiff has failed to come forward with any evidence to discredit Magic Hat's asserted reasons for treating him differently than Winnick in connection with his poor work performance. Plaintiff has also failed to submit any evidence that discrimination was more likely than not Magic Hat's motivation for firing him for poor performance without first lowering his salary. Since Plaintiff has made no attempt to satisfy his burden of showing by a preponderance of the evidence that Magic Hat's stated reasons for terminating him for poor performance without first lowering his salary is pretextual, we conclude that he has not responded to the Motion for Summary Judgment with a factual showing sufficient to establish that Magic Hat intentionally discriminated against him by terminating him without first lowering his salary.  See Celotex, 477 U.S. at 322; see also Anderson, 621 F.3d at 271.  We therefore grant Magic Hat's Motion for Summary Judgment as to this aspect of Counts I and IV.

We further conclude, for the reasons stated above, that Plaintiff has failed to satisfy his burden of presenting evidence that creates a genuine issue of material fact regarding whether Magic Hat discriminated against him on the basis of his race in violation of Title VII and the

PHRA.  We therefore grant Magic Hat's Motion for Summary Judgment as to Counts I and IV of the Complaint.

      B.      <u>Hostile Work Environment</u>

Plaintiff asserts in Count II of the Complaint that Magic Hat subjected him to a hostile work environment in violation of Title VII.  In order to establish a prima facie case of hostile work environment in violation of Title VII, Plaintiff must show that:  "(1) [he] suffered intentional discrimination because of [his] race . . . ; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) the discrimination would have detrimentally affected a reasonable person of the same race in [his] position; and (5) there is a basis for employer liability."  <u>Hanzer v. Mentor Network</u>, No. 14-4333, 2015 WL 1967307, at *4 (3d Cir. May 4, 2015) (per curiam) (citing <u>Aman</u>, 85 F.3d at 1082).  Magic Hat argues that it is entitled to summary judgment on this claim because Plaintiff cannot establish any of the first four elements of a prima facie case.

The Third Circuit has explained that, in order to prove a hostile work environment claim, a plaintiff must show that his "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'"  <u>Peace-Wickham v. Walls</u>, 409 F. App'x 512, 519 (3d Cir. 2010) (quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002)).  "The environment must be objectively hostile, not just hostile in the plaintiff's view."  <u>Greer v. Mondelez Global, Inc.</u>, 590 F. App'x 170, 173 (3d Cir. 2014) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).  We examine the following factors in determining whether Plaintiff has made this showing:  "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

16

whether it unreasonably interferes with an employee's work performance.'" Peace-Wickham, 409 F. App'x at 519 (quoting Harris, 510 U.S. at 23). "'[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). "Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Faragher, 524 U.S. at 778). In our examination of whether the discriminatory conduct "is sufficiently extreme, we consider the 'totality of the circumstances.'" Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)). Thus, our analysis focuses "'not on individual incidents, but on the overall scenario.'" Id. at 262-63 (quoting Andrews, 895 F.2d at 1484; and citing Harris, 510 U.S. at 23).

Plaintiff states that the following incidents, which we view cumulatively, created a hostile work environment:  (1) Merritt spoke to Plaintiff several times about the trial of George Zimmerman for killing Trayvon Martin, including comments that indicated that Merritt approved of racial profiling; (2) Merritt told Plaintiff about his purchase of a new gun; and (3) Merritt made comments to Plaintiff implying that potential clients, who are African-American, were using Magic Hat for a free meal.  Merritt is a practice director for Magic Hat, focusing on the sales and delivery of Business Process Improvement, i.e., assisting clients to improve their business processes.  (Merritt Aff. ¶ 1.)  There is evidence in the record that Merritt spoke to Plaintiff about the trial of George Zimmerman on four or five occasions.  (Mingo Dep. at 156.) During a few of those occasions, Merritt told Plaintiff that "he believes that it's okay for blacks to be racially profiled in a criminal setting."  (Id. at 153, 159.)  On another occasion, Merritt introduced the topic of George Zimmerman's trial by saying:  "I have this black friend that I

17

usually talk about these issues with but I wanted to get your opinion on the Trayvon Martin trial." (Id. at 156.)  Around the same time, Merritt also told Plaintiff that he is a registered gun owner and had ordered a gun called "the Judge" that shoots shotgun shells.  (Id. at 158.) Plaintiff considered these conversations offensive, and the conversations about Merritt's gun ownership made him uncomfortable.  (Id. at 157-59.)   In addition, during the last week that Plaintiff worked for Magic Hat, he and Merritt had lunch at an expensive restaurant with two African American individuals who worked for SunGuard and were potential clients.  (Id. at 219.) After their meal, they continued their meeting at the Penn Hotel, where Merritt "started talking about how they were trying to use us for the . . . dinner." (Id. at 222.)  Plaintiff believed that Merritt's statement, made in front of the potential clients, was "in the poorest taste ever" and was offensive.  (Id. at 222, 224.)

Viewed cumulatively, Plaintiff's evidence in support of his hostile work environment claim consists of several conversations with another employee of Magic Hat.  Plaintiff does not claim that Merritt physically threatened or humiliated him or that these conversations affected his work performance.   "'Mere offensive utterances' are insufficient to create a hostile environment, even if they engender offensive feelings in an employee." Greer, 590 F. App'x at 173 (quoting Breeden, 532 U.S. at 271; and citing Caver, 420 F.3d at 262).   Viewing the evidence in the light most favorable to Plaintiff, we therefore conclude that the statements made by Merritt do not show that that Plaintiff's "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Peace-Wickham, 409 F. App'x at 519 (quoting Morgan, 536 U.S. at 116).   While Merritt's statements to Plaintiff were unwelcome, and may have been unprofessional, "[t]aken together, these comments are not the

18

type of severe and pervasive conduct necessary to constitute a hostile work environment."

Greer, 590 F. App'x at 174.  We conclude, accordingly, that Plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact regarding whether Magic Hat subjected him to a hostile work environment in violation of Title VII.  We therefore grant Magic Hat's Motion for Summary Judgment as to Count II of the Complaint.

## IV.    CONCLUSION

For the foregoing reasons, we grant Defendant's Motion for Summary Judgment in its entirety.  An appropriate order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.

19